## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Angeline Ellis, | Civil No. 11-3411 (SRN/FLN) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Minnesota Department of Human Services, and Lucinda E. Jesson, in her official capacity as Commissioner of the Minnesota Department of Human Services, | |
| Defendants. | |

Karl L. Cambronne and David A. Rephan, Chestnut Cambronne PA, 17 Washington Ave. North, Suite 300, Minneapolis, MN 55401; and Jeffrey W. Schmidt, Schmitz & Schmidt, P.A., 400 Robert St. North, # 1840, St. Paul, MN 55101, for Plaintiff.

Cynthia B. Jahnke and Corrie A. Oberg, Assistant Attorneys General, Office of the Attorney General, State of Minnesota, 445 Minnesota St., Suite 900, St. Paul, MN 55101, for Defendants.

SUSAN RICHARD NELSON, United States District Judge

This matter is before this Court on the motion for a temporary restraining order and a preliminary injunction by Plaintiff Angeline Ellis (Doc. No. 2). Plaintiff seeks to prevent the implementation of a new state Medicaid rule, scheduled to impact any recalculations of penalty periods imposed on or after December 1, 2011, under the assumption that it will result in a longer period during which she will be unable to receive long-term care benefits. For the reasons stated below, however–including the fact that the new state rule simply will not adversely impact Plaintiff under the governing facts in this case–this Court denies the motion.

## I.        FACTUAL AND PROCEDURAL BACKGROUND

On November 21, 2011, Plaintiff filed her Complaint against Defendants

Minnesota Department of Human Services, and Lucinda E. Jesson, the Commissioner of

the Department (collectively, "the State"), seeking injunctive relief, a declaratory

judgment, and damages.  (Doc. No. 1, at 8.)  Plaintiff alleges that a new state rule,

scheduled to go into effect on December 1, 2011, will deprive her, in violation of federal

law, of a certain period of long-term care benefits under Minnesota's Medicaid program,

Medical Assistance.  On November 22, 2011, she filed the present motion seeking to

enjoin the implementation of the new state rule.  (Doc. No. 2.)

Although Congress created Medicaid in 1965 as a joint federal-state program to

provide medical care to those who could not afford it, Congress has been fighting, since

1982, the problem created by those who voluntarily elect to impoverish themselves by

transferring their assets to others, usually family members, in an attempt to qualify for

medical assistance from a program designed to be only a payor of last resort for those

truly unable to pay for their own medical care.  Congress' latest legislative effort to

combat such "uncompensated transfers" occurred in 2005, when it amended the Medicaid

program, effective February 8, 2006, to (among other things) lengthen the "look-back"

period to 60 months, during which any uncompensated transfers would result in a penalty

period temporarily precluding the receipt of long-term care benefits, although allowing

other Medicaid-covered services such as physician costs and medications.  42 U.S.C. §

1396p(c).  The 2005 amendments eliminated the applicant/donor's ability to transfer

assets and have the penalty period "time out" before the donor applied for long-term care. (Doc. No. 14, at 7.) But the federal law, as interpreted by the Centers for Medicare & Medicaid Services ("CMS"), the federal agency charged with administering the Medicaid program, left open the possibility that the penalty period as originally computed could be shortened by returning a portion of the transfer during the penalty period. (Id.) Estate-planning attorneys soon developed techniques to exploit this loophole through a "'dribble back' strategy" that "allowed family members to keep substantial portions of uncompensated transfers." (Id. at 7-8.)

In 2009, in the ongoing effort to prohibit attempts to obtain Medicaid benefits through such strategic divesting of assets, the Minnesota legislature amended the State's Medicaid law. The new statute–enacted with a delayed effective date of January 1, 2011, in order to allow the State to obtain federal approval of the change–addresses the partial repayment of "uncompensated transfers," that is, a Medicaid applicant's pre-application transfer of funds or other assets for less than fair market value:

> A period of ineligibility established under paragraph (c) may be eliminated *if all of the assets* transferred for less than fair market value used to calculate the period of ineligibility, or cash equal to the value of the assets at the time of the transfer, are returned within 12 months after the date of the period of ineligibility began. *A period of ineligibility must not be adjusted if less than the full amount of the transferred asset or the full cash value of the transferred assets are returned.*

2009 Minn. Laws, ch. 79, art. 5 § 22 (emphases added), codified at Minn. Stat. § 256B.0595, subd. 2(f).

In 2010, however, Congress, enacted (as part of the Affordable Care Act) the

"maintenance of effort" (MOE) requirement, which prohibits states, beginning March 23, 2010, from amending their Medicaid eligibility requirements such that any new state "eligibility standards, methodologies, or procedures" would be "more restrictive than the eligibility standards, methodologies, or procedures, respectively, under the plan or waiver that are in effect on March 23, 2010."  42 U.S.C. § 1396a(gg)(1).

In the interim, other states also sought to implement the 2005 federal law into their Medicaid programs.  Connecticut, for example, tried a different approach, albeit unsuccessfully.  In response, CMS offered "some alternative approaches" that CMS viewed as being in compliance with the MOE requirement.  (Doc. No. 15 (Affidavit of Ann Berg), Ex. 1, at 2.)  On October 28, 2010, CMS informed Connecticut that

> [o]ne permissible alternative would be for the State to choose not to recognize these partial returns and simply continue the penalty period uninterrupted and unaltered from the original calculation, absent [a full return of the uncompensated transfer].

(Id. at 3.)   In response to questions as to whether such an alternative would violate the MOE requirement, CMS clarified that its policy has been

> that such a change in a State's transfer of assets policy implicated Medicaid payment for services, but not the individual's underlying Medicaid eligibility.  Medicaid payment is still available for covered services that are not subject to the penalty.

(Id.)

Accordingly, Minnesota adopted the approach that CMS suggested would comply with the MOE requirement.  On February 24, 2011, Minnesota sought approval of its State Plan Amendment to incorporate the state legislature's 2009 amendments that

eliminated recalculation of penalty periods for partial returns.  (Id., Ex. 3.)

On August 5, 2011, CMS informed all of the state Medicaid program directors that changing asset transfer requirements would comply with the MOE requirement because such a change would affect *benefits* rather than *eligibility*.  (Doc. No. 15 (Berg. Aff.), Ex. 2, at 10-11.)  CMS explained that states may, without making "the eligibility and renewal process more restrictive and burdensome for eligible individuals," change their "transfer of assets requirements to the extent they affect benefits rather than eligibility."  (Id.)

On September 23, 2011, CMS approved Minnesota's proposal (as modified).  (Id., Ex. 7.)  Minnesota's new Medicaid plan provides in relevant part:

> **Eliminating a Penalty Period Established on or after January 1, 2011:**
> A penalty period cannot be shortened by a partial return of assets used in the calculation of the penalty period.  A penalty period can be eliminated only if the transferors have all assets that were included in the calculation of the penalty period returned to them.

(Id., Ex. 7, § A.10.)

Accordingly, on November 4, 2011, the State issued Bulletin #11-21-10, providing that "[e]ffective with any transfer penalty imposed on or after December 1, 2011, a transfer penalty does not change unless the transferor(s) receive a full return of the transferred assets or the agency approves a waiver of the transfer penalty due to an undue hardship."  (Doc. No. 16 (Affidavit of Kim Carolan), Ex. 2.)

Plaintiff, an eighty-three year old woman who was temporarily hospitalized on October 8, 2011 after a fall, and again on or about November 19, 2011, after experiencing hallucinations, currently resides with her daughter.  (Doc. No. 6.)  Plaintiff's treating

physician stated that "the primary reason for home health care" was "[d]ementia and arthritis." (Doc. No. 5-1, at 4.) "[C]linical findings support that this patient is both homebound and in need of skilled home care services because [she] [n]eeds assistance for all activities." (Id. at 5.) Plaintiff experiences confusion and would be "unsafe to be out of home alone." (Id.) She requires "[s]killed [n]ursing" and "[p]hysical [t]herapy." (Id.)

Her daughter asserts, however, that she is unable, for lack of the requisite "medical training or expertise" as well as for financial reasons, to provide in her home the level of care her mother needs. (Doc. No. 6, ¶¶ 3, 4.) Plaintiff thus applied for Medical Assistance on November 22, 2011, seeking long-term care among other benefits.

Within the last five years, however, Plaintiff had provided her son $17,000, which they claim was a loan, but which is treated as a gift due to the lack of any documentation of the purported loan. Although her son has since repaid approximately $12,000 of the "loan," he states–with decisive consequence here–that he is financially unable to repay the remaining $5,000. (Doc. No. 5, ¶ 3.) Plaintiff now alleges that the State's new policy will adversely impact the calculation of her penalty period and, therefore, violate federal law–that is, that the State's change in how it treats partial repayments of uncompensated transfers for calculating penalty periods is a more restrictive standard, methodology or procedure of "eligibility" than what it imposed before March 23, 2010.

After ordering briefing by Defendants (Doc. No. 10), this Court heard oral argument on the motion (Doc. No. 18). The Court thus deems the motion as one seeking only a preliminary injunction, not a temporary restraining order.

6

## II.    DISCUSSION

Plaintiff presently seeks a preliminary injunction under Rule 65. (Doc. No. 2, at 2.) In response, the State chiefly contends that injunctive relief is not warranted because Plaintiff has failed to show (1) any likelihood of success on the merits, or (2) any impending irreparable harm. (Doc. No. 14, at 1.)[1]

### A.    Preliminary Injunction Standard

A preliminary injunction "is an extraordinary remedy never awarded as a matter of right." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). In Planned Parenthood Minnesota v. Rounds, the *en banc* Eighth Circuit clarified the analysis for

---

[1]       Defendants also raise the Eleventh Amendment argument that this Court is barred from hearing claims against the State or any of its departments unless the State has consented to such suits or Congress has expressly abrogated the State's sovereign immunity. (Doc. No. 14, at 27.) Defendants note, however, that "[t]his argument does not apply to Defendant Commissioner." (Id. at 28 n.5.) The Supreme Court has construed the Eleventh Amendment, which by its express terms applies only to actions against states by citizens of other states, to nevertheless also bar suits in federal court against a state by its own citizens. *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974). Moreover, the immunity afforded a state in federal court extends to agencies of the state. *Florida Dept. Of Health & Rehabilitative Servs. v. Florida Nursing Home Assn.*, 450 U.S. 147 (1981). "It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Pennhurst State School & Hosp. v. Haldeman*, 465 U.S. 89, 100-01 (1984). That Plaintiff here seeks declaratory and injunctive relief from the Department does not evade this immunity. *Id.* ("This jurisdictional bar applies regardless of the nature of the relief sought."). Although this Court does not presently face any proper motion to dismiss claims against the Department, the jurisdictional nature of the State's immunity would preclude granting Plaintiff any preliminary relief against the Department. But since *Ex Parte Young*, 209 U.S. 123 (1908), the Supreme Court has long recognized an exception to Eleventh Amendment immunity permitting suits in federal court against state *officials* alleged to have violated federal law, at least where the relief sought is only prospective injunctive or declaratory relief from a state officer in their official capacity. Verizon Maryland Inc. v. Public Service Comm'n of Maryland, 535 U.S. 635, 645-46 (2002).

preliminary injunctive relief.  530 F.3d 724 (8th Cir. 2008) (*en banc*).  The court noted

that under its earlier *en banc* decision in Dataphase Systems, Inc. v. C L Systems, Inc.,

issuance of preliminary injunctive relief

> depends upon a "flexible" consideration of (1) the threat of irreparable harm
> to the moving party; (2) balancing this harm with any injury an injunction
> would inflict on other interested parties; (3) the probability that the moving
> party would succeed on the merits; and (4) the effect on the public interest.

Rounds, 530 F.3d at 729 (citing 640 F.2d 109, 113 (8th Cir. 1981) (*en banc*)).  With

respect to succeeding on the merits, the Rounds court ruled that unless the movant is

seeking to enjoin "government action based on presumptively reasoned democratic

processes," courts "should still apply the familiar 'fair chance of prevailing' test."  Id. at

732.  The "fair chance" standard is less demanding than the "likely to prevail" standard

applicable to injunctions sought against governmental action such as a statute, and a "fair

chance of prevailing" does not require a greater than fifty per cent likelihood of prevailing

on the merits.  See Rounds, 530 F.3d at 731 (quoting Dataphase, 640 F.2d at 113).[2]

Here, Plaintiff suggests that the State's new rule was not subject to any public

---

[2]     The application of the four-factor analysis must be a "flexible" one.
Rounds, 530 F.3d at 729 n.3.  Thus any "effort to apply the probability language with
mathematical precision is misplaced."  Dataphase, 640 F.2d at 113.  Therefore, courts
usually apply a "sliding-scale" approach.  See generally 11A Charles Alan Wright et al.,
Federal Practice and Procedure § 2948.3 (2d ed. 1995) (explaining flexible relationship
between success on the merits and irreparable injury).  In Winter v. Natural Resources
Defense Council, Inc., however, the Supreme Court held that the requisite showing of
irreparable harm may not be lessened to a mere "'possibility' of irreparable harm" based
upon "a strong likelihood of prevailing on the merits."  555 U.S. at 22.  In other words,
while the overall analysis of the four relevant factors is generally a flexible one, a
likelihood of actual irreparable harm remains essential and the movant's burden on that
factor may not be diminished based on a strong showing of the other three factors.

notice and comment procedures.  The State notes that there is no basis to assume that the legislature's amendment of the State's Medical Assistance statute was not openly debated and enacted.  In any event, even applying the less demanding "fair chance of prevailing" standard, Plaintiff still has not made the necessary showing.

The other key factor in any analysis of preliminary injunctive relief is, of course, irreparable harm.  Chicago Stadium Corp. v. Scallen, 530 F.2d 204, 206 (8th Cir. 1976).  Indeed, "'[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.'"  Rounds, 530 F.3d at 732 n.5.  Thus, lack of irreparable harm will preclude preliminary injunctive relief regardless of the other factors.  Dataphase, 640 F.2d at 114 n.9 ("[T]he absence of a finding of irreparable injury is alone sufficient ground for vacating the preliminary injunction.").  Therefore, to warrant a preliminary injunction, the moving party must demonstrate a sufficient threat of irreparable harm.  Bandag, Inc. v. Jack's Tire & Oil, Inc., 190 F.3d 924, 926 (8th Cir. 1999) (per curiam); see, Winter, 555 U.S. at 22 (explaining that its "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction" (emphasis in original)).

Beyond these two key factors of success on the merits and irreparable harm, the other two relevant factors are the balance between that harm and the harm injunctive relief would cause to the other litigants and the public interest.  Dataphase, 640 F.2d at 114; accord Watkins, Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003) (quoting Dataphase).

In applying these factors, this Court must "flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene."  Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., 182 F.3d 598, 601 (8th Cir. 1999).  The burden of establishing the four Dataphase factors lies, of course, with the party seeking injunctive relief.  Watkins, 346 F.3d at 844.

### B.    A Preliminary Injunction Is Not Warranted Here

With this standard in mind, the Court now addresses whether Plaintiff's motion for a preliminary injunction merits such extraordinary relief.  As noted above, one of the key requirements for obtaining injunctive relief is the fact that the movant would suffer irreparable harm absent such relief.

### 1.    Irreparable Harm

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages."  Gen. Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312, 318-19 (8th Cir. 2009).  Here, Plaintiff has not made a strong showing of any irreparable harm, particularly when weighed against the State's interest in limiting long-term care under its Medical Assistance program to those genuinely unable to pay for their own care.

### (a)    Plaintiff Has Not Demonstrated She Is Suffering, Or Will Suffer, Any Irreparable Harm From The Implementation Of The New Policy

Most importantly, the new rule will *not* have any adverse impact on Plaintiff under the facts presented by the current motion.  In his sworn affidavit, Plaintiff's son flatly

states that "[f]or financial reasons, [he] is now *unable* to return the remaining $5,000."

(Doc. No. 5, ¶ 3 (emphasis added).)  Accordingly, there will be no further repayment that

could be subject to the new state rule.  Under existing law–as well as under the new

rule–the State requires the relevant county to determine the uncompensated transfer by

subtracting the amount already repaid from the original "loan" amount.  Because

Plaintiff's son already has repaid $12,000 of the original $17,000 "loan," the value of the

uncompensated transfer will be $5,000.[3]  The new state rule "prohibits counties from

adjusting the transfer *penalty* – not the uncompensated transfer *value* – unless full

compensation of any uncompensated transfer value, determined at the time the penalty

period is assessed, is received *after* the transfer penalty has been determined."  (Doc. No.

19, ¶ 8 (emphasis in original).)  Thus, given that Plaintiff's son has stated he will not be

able to make any further repayments, no new recalculation of the existing penalty period

would occur, *regardless* of the December 1, 2011 implementation of the new policy.  As

the State Bulletin explains, "[p]rior to the release of this bulletin, a financial worker was

required to recalculate a transfer penalty each time assets were returned in whole or in

part to the individual.  Effective with any transfer penalty imposed on or after December

1, 2011, a transfer penalty does not change unless the transferor(s) receive a full return of

the transferred assets or the agency approves a waiver of the transfer penalty due to an

undue hardship."  (Doc. No. 16, Ex. 2, at 2-3.)

---

[3]   Although "[t]his amount may be further reduced . . . by any further return Ms. Ellis receives from [her son] prior to Hennepin County's calculation of the transfer penalty" (Doc. No. 19, ¶ 7), her son has indicated that he is unable to make any such further repayments.

In short, the original calculation of the penalty period will be the same under the existing state law as it will be under the new rule.  The new rule only prohibits any subsequent recalculation of that period *if* (and when) further repayments are made after the initial calculation.  And in this case, that contingency will not occur according to Plaintiff's son.  The new rule simply is not implicated here.[4]

In any event, Plaintiff essentially claims that any delay in providing her with long-term care under Minnesota's Medical Assistance program is an issue of life or death for her because she "does not have the luxury of postponing long-term care."  (Doc. No. 4, at 7.)  But some delay is inevitable here.  Plaintiff applied for Medical Assistance only on November 22, 2011, and while a decision is due within 45 days, none yet has been made.  (Doc. No. 14, at 14.)  Because her application is thus currently pending, the State asserts that Hennepin County has not yet "made an eligibility determination regarding Ellis' eligibility for MA or MA payment of long term care services, imposition of a penalty period due to an uncompensated transfer, or a hardship waiver request or decision

---

[4]      Plaintiff argues that the Bulletin somehow conflicts with the State's position that there will be no change in how the value of the uncompensated transfer is currently determined," because the Bulletin announces a "Policy <u>Change</u> Regarding Transfer Penalties."  (Doc. No. 20, at 1 (emphasis in original).)  Granted, the Bulletin indicates, of course, that there is a policy change.  But the change is that under the new rule the originally calculated "transfer penalty does not change" upon any subsequent repayment of assets to the Medicaid recipient, whereas previously the relevant county "was required to recalculate a transfer penalty each time assets were returned in whole or in part."  Plaintiff's different understanding–in effect, a misunderstanding in light of the position articulated in the State official's affidavits–simply underscores the ambiguity that warrants this Court's deference to the agency's position.

regarding such a request." (Doc. No. 16 (Affidavit of Kim Carolan), ¶ 4.)[5]  The State

argues that "[o]nce the determination is made *and* Plaintiff is found eligible for the

Medical Assistance Program, Hennepin County will have to assess whether she has

uncompensated transfers that would require a penalty period to be assessed." (Doc. No.

14, at 22 (emphasis in original).)  In addition, "[i]f Ellis is found eligible and is

determined to have uncompensated transfers, the uncompensated transfer is likely to be

only $5,000," resulting in penalty period of "slightly less than one month." (Id.).[6]  That

calculation would be the same, under both the new and old rules.  Finally, under either the

old or new rule, the State is required by federal law to grant a waiver if the applicant

would otherwise suffer undue hardship.

> **(b)     The Harm To The State Outweighs Any Harm Plaintiff
>              Would Incur Absent An Injunction**

A related <u>Dataphase</u> factor requires this Court to balance the harm alleged by

---

[5]        The State also presents this argument as one of ripeness, one of the
justiciability components that emanate from Article III's case and controversy
requirement. (Doc. No. 14, at 25-26.)  Although there may be an argument that the
present lack of certain actions by Plaintiff and of decisions by the State undermine the
ripeness of the dispute so as to preclude the Court's jurisdiction, this Court need not
address such issues in light of its disposition of the present motion.

[6]        The parties dispute the length of the likely penalty period (based on the
assumption that $5,000 of the original $17,000 "loan" remains to be repaid).  The State
asserts that under the governing formula, the period is computed "by dividing the
uncompensated transfer value ($5,000) by the SAPSNF ($5,340), which equals a penalty
period of less than one month." (Doc. No. 19 (Second Affidavit of Kim Carolan), ¶ 7.)
Plaintiff contends that the penalty period would exceed three months, apparently viewing
the new rule as prohibiting consideration of *any* repayment of the transfer, including the
$12,000 Plaintiff's son already has repaid here.  Plaintiff's interpretation of the new rule
is apparently mistaken.

Plaintiff against the harm an injunction would cause other parties.  Rounds, 530 F.3d at 729 (citing Dataphase, 640 F.2d at 113).  Plaintiff claims that the State need not implement the new rule because it has demonstrated that it can continue to adhere to the pre-December 1, 2011 policy.  (Doc. No. 4, at 7-8.)

The State submits that in contrast to the "speculative" and temporary harm that Plaintiff might suffer, "Defendants would suffer a significant and quantifiable harm from the delayed implementation" of the new rule.  (Doc. No. 14, at 23.)  The State claims that without the new rule, it will incur substantial additional costs to its Medical Assistance program.  (Id. at 24; Doc. No. 16, Ex. 3.)

The Court agrees with the State that the relative balance of harms does not favor Plaintiff.

### 2.      Plaintiff Has Not Established A Fair Chance of Success on The Merits

As noted above, where a movant has made a strong showing of irreparable harm, and that such injury plainly outweighs that which would be imposed on the other party if the injunction is granted, the movant need only show that they have a "fair chance of prevailing" on their claims.  Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 732 (8th Cir. 2008).  Here, however, Plaintiff has not made a strong, if any, showing of irreparable harm.  And, obviously, "[a]n injunction cannot issue if there is no chance on the merits."  Mid-Am. Real Estate Co. v. Ia. Realty Co., 406 F.3d 969, 972 (8th Cir. 2005).  Insofar as the new rule will not even be implicated on the facts of this case, Plaintiff has no discernible chance of prevailing on the merits.

14

But even if the new rule somehow would apply here, this Court finds that Plaintiff still has not made a strong showing of any likely success on the merits. Plaintiff argues that Minnesota's new rule conflicts with the MOE requirement and is thus preempted by federal law. Despite the fact that CMS approved the State's new rule on the grounds that it affects benefits rather than eligibility, Plaintiff argues that any such distinction is simply a "word-game," because if a Medicaid applicant is precluded from obtaining long-term care benefits because of being subject to a penalty period, the applicant, for all practical purposes, has been denied "eligibility," at least for that particular aspect of the Medicaid program. Plaintiff notes that the 2009 amendment of the state statute itself refers to the consequences of a partial return of assets transferred by the applicant as "[a] period of *ineligibility*." Minn. Stat. § 256B.0595, subd. 2(f) (emphasis added).

Granted, both Congress in establishing the MOE requirement and the Minnesota legislature in enacting the 2009 amendment used the term "(in-)eligibility."[7] But, of course, the Minnesota legislature could not have intended its choice of words in 2009 to parallel that of Congress when it enacted the MOE requirement in 2010. Moreover, in the present context, "eligibility" is plausibly ambiguous–is it confined to an applicant's ability to satisfy the requirements of the Medicaid program in general, or does it also extend to an applicant's ability to receive benefits for a particular form of care under the

---

[7]     The federal Medicaid statute does not, at least in its definitional section, 42 U.S.C. § 1396d, define either "eligibility" (or "ineligibility") or "benefits." The Court notes, however, that for purposes of Subsection 1396d(y), a provision apparently not relevant here, Congress defined both "newly eligible" and "full benefits." 42 U.S.C. § 1396d(y)(2). The separate definitions perhaps suggest a difference between "eligibility" and receipt (or denial) of "benefits."

overall program?

The State asserts that because its new rule "affects only the payment of benefits and not eligibility for Medical Assistance, it does not run afoul of the Affordable Care Act's prohibition on new restrictions for Medicaid eligibility." (Doc. No. 14, at 16.)  The State contends that the federal agency charged with overseeing the Medicaid program, the CMS, has in effect resolved the statutory ambiguity against Plaintiff's position, such that CMS's interpretation is entitled to deference from this Court.  (Id. at 17.)  As the State observes, even if Plaintiff would be subject to a penalty period for receiving long-term care benefits, she would not thereby be precluded from receiving other Medicaid-covered services.  (Doc. No. 14, at 20.)

Plaintiff argues that this Court does not owe CMS's approval any deference, because an agency lacks the authority to interpret an unambiguous statute in a fashion inconsistent with what Congress enacted.  This Court does not agree, however, that "eligibility," in the present statutory context, is unambiguous.  In addition, the Secretary's approval of a state Medicaid plan would be entitled to substantial deference.  *State of New York v. Shalala*, 119 F.3d 175, 180 (2d Cir. 1997) ("Substantial deference is normally accorded to determinations made by the Secretary concerning the approval of [State Plan Amendments]".).

Similarly, the Eighth Circuit has held that the *disapproval* of a State Medicaid plan by CMS is set aside only if "it is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or contrary to law."  *Iowa Dept. of Human Services v. Centers*

*for Medicare and Medicaid Services*, 576 F.3d 885, 888 (8th Cir. 2009) (denying state's

petition for review of Secretary's disapproval of state's plan proposing changes to

Medicaid drug program).  *Accord Pharmaceutical Research and Manufacturers of*

*America v. Walsh*, 538 U.S. 644, 661 (2003) (noting that if Secretary would reject State's

amendment of its Medicaid plan, "the Secretary's ruling would be presumptively valid").

But in *Iowa Department of Human Services*, the Secretary's disapproval concerned

whether the state's plan complied with *regulations* that the federal agency itself had

promulgated.  *Id.* (noting that it "must give substantial deference to an agency's

interpretation of its own regulations").

　　　Here, however, the question is whether Minnesota's plan complies with a federal

*statute*, that is, Section 1396a(gg)(1).  But as the D.C. Circuit has ruled, the Secretary's

interpretation of Section 1396a is reviewed "under the familiar and deferential two-part

framework of *Chevron U.S.A., Inc. v. Natural Resources Defense Council*."

*Pharmaceutical Research and Manufacturers of America v. Thompson*, 362 F.3d 817,

821 (D.C. Cir. 2004) (affirming summary judgment for Secretary of Health and Human

Services on drug manufacturer organization's claims).  The Secretary's decisions

interpreting the Medicaid statute are entitled to *Chevron* deference because they "carry

the force of law."  *Id.*  With respect to the Medicaid Act, the delegation of authority to the

Secretary is not merely implicit "through the grant of general implementation authority."

*Id.* at 821.  Rather, Congress "expressly conferred on the Secretary authority to review

and approve state Medicaid plans as a condition to disbursing federal Medicaid

17

payments." *Id.* at 821-22.

### 3.     The Public Interest Does Not Favor An Injunction

The final factor in the analysis is consideration of the public interest.  Courts

"'should pay particular regard for the public consequences in employing the extraordinary

remedy of injunction.'"  <u>Winter</u>, 555 U.S. at 24.

Plaintiff argues that the provision of Medicaid benefits reflects the federal and

state policy of providing medical care to those who lack the resources to pay for it

themselves.  (Doc. No. 4, at 8-9.)  The State contends that Congress' long-running

attempts to confine Medicaid to those truly unable to afford their own medical care

constitutes a federal policy that supports Minnesota's new rule.  "Public policy favors

closing the loopholes that allow persons with sufficient assets to prematurely access

Medicaid funds for long term care."  (Doc. No. 14, at 24.)  Insofar as the Medicaid

program reflects the policy of providing medical care for those who genuinely cannot

afford it themselves, public policy also favors the conservation of limited public resources

for those who are truly needy.

As Plaintiff herself recognizes, Medicaid is a program confined to being "'the

payor of last resort.'"  (<u>Id.</u> at 8 (quoting <u>In re Rosckes v. County of Carver</u>, 783 N.W.2d

220, 224 (Minn. Ct. App. 2010)).)  To ensure the continuing fiscal viability of the

Medicaid program, it must be limited to those who truly lack the ability to pay for their

own care.  Congress's efforts–and those of the States that implement their respective

programs–over the last thirty years to combat the problem of voluntary impoverishment

CASE 0:11-cv-03411-SRN-FLN   Document 21   Filed 11/30/11   Page 19 of 19

reflects the policy of conserving limited public resources for those genuinely in need.

Plaintiff's transfer of funds to her son simply raises the question of whether she lacks the

resources to be eligible for the long-term care she now seeks.  Thus, under the present

circumstances, the relevant public policy interests do not favor a preliminary injunction.

### 4.    Conclusion

On balance, Plaintiff has not shown that preliminary injunctive relief is warranted

here.  It is far from clear that implementing the new state rule would inflict irreparable

harm, or any harm, on Plaintiff.  In fact, under the State's interpretation of the new rule, it

will not even be implicated in this case.  Thus, Plaintiff is not likely to succeed on the

merits of her claim.  On these bases alone, denial of the motion for a preliminary

injunction would be proper.  The remaining factors of the relative balance of harms and

the public interest likely support–and at least plainly fail to alter–this conclusion.

## III.    ORDER

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.    Plaintiff's motion [Doc. No. 2] is **DENIED AS MOOT IN PART** (insofar

as it seeks a temporary restraining order); and

2.     Plaintiff's motion [Doc. No. 2] is **DENIED IN PART** (insofar as its seeks

a preliminary injunction).

Dated:   November 30, 2011                         ___ s/ Susan Richard Nelson ___
                                                   SUSAN RICHARD NELSON
                                                   United States District Judge

19